Next case is 23-14-17, ParksVision v. TLC. You're up again. And I apologize about that if there's repetition, but new record. Good morning again. So again, let's talk about why we're here today. Why we're here today, again, is the PTAB decided that in this case, it's a little different. It's attorney argument plus no evidence, What do we got in this case? Oh, I'm sorry. So this case, it's the 835 patent. And the 835 patent, the particular references are Hulco and Schillitz and Gibson. So it's a different set of patents. And this patent's directed to a cable modem. And so what happened? In this case, the PTAB decided that attorney argument, no evidence, and in this case, bare expert assertions can invalidate a patent. And again, we don't believe that's correct. We believe that it turns the process on its head, and I'll explain why. And we believe that this court should address this issue and that the invalidity claim, the invalidity determination of the PTAB should be reversed. Again, two issues. Issue number one is there was administrative procedures act violation. Issue number two is that there was no substantial evidence that Gibson, Hulco, and Schillitz disclosed a storage element that stores non-negligible amounts of energy. So going to the Administrative Procedures Act, what do we have here? In first time in the reply brief, TCL, the petitioner, raised the issue of this federal circuit case for the first time. We moved to strike and said that they knew about this issue. They should have raised it before. And the board said, nope, too bad. We're going to move forward. And they did not strike this new evidence or a new position. And we believe that's an abuse of discretion. So with regards to what happened, when the petitioner submitted their petition, they attached an exhibit. In this case, it's exhibit 1011, which was the district court's prior Markman decision, which specifically talked about a storage element storing, at least uncontested parts, storing non-negligible amounts of energy, which TCL now says open flexicography. And so, and I don't know if I said this, and that exhibit 1011, I think it's in appendix 370. You can see where they cited to it. And that's the court order from the district court attached to the petition. Didn't address, at that point, it was their burden to address the issue in their petition. They should have addressed it. They didn't. And so they just left non-negligible amounts of energy alone. Didn't say anything. We came along. We talked about non-negligible amounts of energy. Then, in response, for the first time, they brought up the Qualcomm Parker Vision case from 2015. And in that case, the Federal Circuit talked about what the inventor talked about. But we never heard the argument before. Now, we're at the point of a surreply. Our expert has no ability. Our expert has talked about non-negligible amounts of energy. Our expert has explained why it's relevant. And the one thing I want to point out, because I do think it's important, is that our expert, they say, well, you know, and Dr. Steer, specifically during his deposition, and this is appendix 2242 to 2243, page 62, column 23 to 6325, he specifically was faced with this Federal Circuit decision. And the only thing he could say was that I don't find what I did calculating non-negligible amounts of energy to be inconsistent with what Mr. Soros talked about in the Fed Circuit and what the Fed Circuit talked about. And so what do we have here? So we have a situation where, on a surreply, we had no, as of right, the ability to have our expert opine and specifically address head-on commercial viability and, sorry. Yeah, so address commercial viability and that it successfully down-converts, which, according to Mr. Soros, which TCL ignores and the PTAB ignores, Mr. Soros specifically stated successful down-conversion means you meet standards. Not just anything that down-converts meets standards. And they just want to ignore that. And the PTAB just wants to ignore that because it's inconvenient. And so at the end, we believe that there was an Administrative Procedure Act violation. It was foreseeable. They knew about it. They had the burden. They should have addressed it. They didn't. And then we're put in the position. And we can't guess what they're going to argue. And so just like they can't guess, we can't guess. But in this case, they knew. They knew. And if you look in our, again, if you look in our reply brief, we address the timing, when they knew about the timing. They filed the petition four months after the district court ruled on what a storage element was. And I believe in this case, I think nine days after we first showed our view of what non-negligible amounts of energy and all those calculations in the first case, that's when they filed their petition in this case. So it was certainly foreseeable that they knew. So in terms of storage elements storing non-negligible amounts of energy, again, here, there's no substantial evidence that the capacitors of HULCO and Schlitz is a storage element that stores non-negligible amounts of energy. Again, Dr. Steer is the only one that to talk about what non-negligible amounts of energy means. He wasn't rebutted. His credibility wasn't questioned. He was just ignored. Ignored. And so the petitioner had the burden. They had the opportunity on a reply to put in an expert declaration. They pay experts, however much they pay experts, and they could not find their expert, Dr. Shoemaker, whatever his name is, unwilling, or they didn't apparently, put in a declaration. All he had to say was, yes, HULCO and Schlitz is commercially viable, it meets the standards, or whatever they wanted to say. They could have done it, and they didn't do it. And that is telling. The fact that they didn't have their expert on a reply support their position, and they just went with, this is what Qualcomm said, that is extremely telling. And so again, what did the PTAB do? So the logic of the PTAB was first, they said, OK, we have non-negligible amounts of energy. What does that mean? Well, fortunately, we have the Federal Circuit in Qualcomm case that tells us. And so they said, that means it's energy distinguishable. The board basically did a carbon copy of what it did in the 1415 case, right? Correct. Correct. OK. OK. We know what the board did. Right. So again, the only thing there was, just like in the other case that we just discussed, in the 1415 case, all there was was attorney argument. That's it. There was no supporting declaration of their experts to support what they were saying. All attorney argument. And again, so what was the board left with? Nothing. There were nothing. Dr. Speer, who they didn't criticize, or they didn't say anything about and say, oh, he's not credible. They just kind of ignored it. And they said, well, again, in this case, Holko and Schlitz just talk about radio applications generally. And because they talk about radio applications, and because patents are viewed to be enabled, somehow enablement magically becomes it's commercially viable. And it meets specifications. And there's no case, again, that I am aware of where enablement of a patent, you presume that it's commercially viable. And you can presume that it meets standards. That case law doesn't exist. And so again, the board was faced to backfill. They had to backfill. So they had to come up with this new argument about enablement. And again, this inherency argument that we raised in our gray brief, they haven't met that standard of inherency. And so the other issue with regards to this is that Dr. Stier also talked about there's no dispute that Holko and Schlitz are sample and hold systems. And they have sample and hold capacitors. TCL doesn't say that it's not the case. And the board doesn't say that's not the case. And Dr. Stier explains that in this case, and I don't believe it was rebutted, that those capacitors only hold negligible amounts of energy. And that's Stier Appendix 2013 to 2017, at paragraph 357 to 366. If inherency is a large part of your argument, weren't you required to preserve it in blue? Because I don't judge it. I'll move on then. I'll move on. And then, so if you don't believe Dr. Stier, OK, I'm sorry. The other part of the appendix for Dr. Stier is Appendix 1999 to 2004, paragraphs 310 to 333. And so Dr. Stier explained that when you have a sample and hold system, which nobody debates that Holko and Schlitz are sample and hold systems, that means that it stores negligible amounts of energy. And if you don't believe Dr. Stier, our patent specifically says that. So in Appendix 1715, and this is the 551 patent, which is incorporated by reference into the 835, on column 66, lines 62 to 65, that patent says, again, incorporated by reference, holding modules and holding capacitance as used above identify systems that store negligible amounts of energy. So don't take Dr. Stier's words for it. Look at our own patent. And when we talk about what a holding system is, and a holding system is a sample and hold system. And so you don't have to take Dr. Word's words for it. You could look at what was said in our patent early on before any litigation happened, in terms of what negligible amounts of energy is, and that sample and hold systems hold negligible amounts of energy. They didn't rebut that. They didn't address it. They didn't talk about it, meaning their expert, TCL's expert. And so the board had nothing to rely upon. Then the last point I want to raise, so I can reserve some time, is a combination of Gibson and Schiltz. So petitioners state that both Gibson and Schiltz disclose mixers. And so this goes to my point about their expert assertions, that when TCL, the petitioner, was putting their combinations together, what their experts said is that, listen, Schiltz and Gibson both talk about mixers, and they both down-convert. That was pretty much the extent of it. Then what happened is that, and they said, oh, that's a bare pronouncement. I view it as a bare pronouncement. And they said, listen, because they both talk about mixers and because they both down-convert, all of a sudden that means you can just swap one for the other, no problem. Not so fast. So Gibson is a non-sampling mixer, called a heterodyne mixer, which is always on. Schiltz works differently. It's a sampling mixer. It turns on and off. You can't just swap one for the other. And Steere addresses this as appendix 1993 to 1994, paragraph 294 to 296, with regards to Gibson, with regards to Schiltz, appendix 1995 to 1998, paragraph 298 to 306. And he says you don't combine them in appendix 2018 to 2022 in paragraphs 381 to 388. So what happens? Dr. Steere explains this. Do they put anything to counter that in the reply? No. Again, in the reply brief, they couldn't get an expert to provide evidence to counter what Dr. Steere said, in reply to what Dr. Steere said. They had the opportunity, and tellingly, the TCL, the petitioner, did nothing. Nobody responded to Dr. Steere. It was unrebutted to respond to what Dr. Steere said. And just to be clear, basically what they're saying is you have two liquids, and they can be swapped. Because they said there's mixers, and they both down convert. In this case, they're basically saying, because you have two liquids, you can just swap them. So if I have a car with a gas tank that I can put gas in, their position is that because both gas and water are liquids, you could put water in place of the gas. These systems don't work together, as Dr. Steere said. They're inconsistent. Once you swap the mixers of Schlitz for Gibson, it changes the system. It's completely different. It's like putting water, because gas and water are both liquids, it's like putting water in a car in a gas tank. And that just doesn't work, and that's the same issue here. And your interior bubble time. Yeah, I'm wrapping up right now. And then so this court has specifically said, combining systems that change the basic principle under which the prior art was designed to operate, or that rendered the prior art inoperable, or for its intended purposes, may fail to support a conclusion of obviousness. That's exactly what happened here. That's Plast-Pak Industries versus Schultzer. That's 600 Fed Appendix 755, 757 to 758. And with that, I'll conclude. Thank you. Good morning. May it please the court, Ted Miley for the appellees. I'm going to respond just briefly on a few things. One was Judge Schen's question about whether the Park Division could have submitted a expert declaration. And that was actually addressed in the Vidal case. It's on page 981. I quote, if Park Division believed Intel's reply raised an issue that was inappropriate for a reply brief, or that Park Division needed a greater opportunity to respond, beyond that provided by the rules, e.g. to include new argument and evidence in its reply, it was incumbent upon Park Division to contact the board and request authorization for an exception to the rules. And that would be authorized under 37 CFR section 42.5B. In the final written decision in our case, this case, the 1417 case, at Appendix 2511 to 2512, which is the order denying the motion to strike, the board made the points that Park Division never explained why it would need new expert testimony, and that it didn't move for new expert testimony, and it could have. And instead they used the limited time in the proceeding to file a procedural motion to strike our reply. I would also note that in the SIR reply below, Park Division expressly conceded, this is at page 2531, and it's also in the final written decision at page 53, they conceded that the showing of down conversion as proof for non-negligible energy is, quote, one way. It's one way to show non-negligible energy. Well, we only need one way. We don't need to do calculations. Park Division did not talk about the claim construct. They had an argument about cable modem be limiting. They made a few arguments, and they didn't talk about it, but I just want to clear the record on their main argument in their opening brief at page 79 was that cable modem is limiting because it provides antecedent basis for some dependent claims. But the board at appendix 25 and 022 held that that argument was waived and not preserved because they brought it up for the first time at oral argument. I think you're better off addressing what your friend addressed this morning. Okay. That's all I was going to say about that. Everything else in the case is substantial evidence. We had evidence and arguments for what the storage modules were, what the motivation to combine was. They had their counter evidence. The board weighed them and determined in our favor, and there's nothing that they've put forth on appeal to show that there was not substantial evidence. Gasoline and water. What about their argument about gasoline and water? You can't just swap one mixer for another because these mixers operate very differently just as gasoline and water do. There was two grounds. I'll go to that. That's the motivation to combine. On ground one, which was Holko with Gibson. Let's just stick to Gibson and Schultz since that's the one that covers all the claims. If you look to appendix, aside from everything that it down converts, it does so in radios, which is in the record. Schultz provided, and aside from Schultz expressly stating to use the switch capacitor as a mixer, which is on appendix 76 to 78, Schultz provided two express reasons for why you would want to use a switch capacitor as a mixer. This is appendix 78. The board also referred to this at appendix 80 to 82. The first reason I will quote from the record, quote, the sample and hold circuit may be accurately operated at high frequencies, unquote. Two, quote, may be applied to virtually any RF and IF signals, unquote. That is a motivation to use a specific mixer. Gibson also has a mixer, but it doesn't disclose what type of mixer it is. It just has the symbol for a mixer, which is a circle with an X in it. And so there's at least three reasons to use it. They both use mixers, and Schultz provides multiple reasons for why. And when the board relied on this evidence, it didn't just say, like we heard earlier in a different appeal today, common sense. The board, and I can quote from appendix 81 to the point about the mixers, the board rejected that argument and said, that argument, that specific argument, quote, does not undermine petitioner's argument in evidence that the particular structures proposed for combination, one, are substantially similar, two, operate in a similar manner, and three, function predictably, and four, with a reasonable expectation of success once combined. That's substantial evidence. The ground one combination, which was not really addressed, did not even rely on the mixers from the secondary reference. Holko, the main reference, taught the mixer and there was no combination. So the argument about the mixers being incompatible is simply irrelevant. If I could quickly talk about storage modules. Again, Parker Vision says that there was no evidence. That's not correct. For the first round, Holko was the storage module at appendix 49 to 50. Holko is a sample and hold circuit. Holko, after it samples the incoming signal, the patent teaches that another switch is open, quote, to transfer the charge on the first capacitor, that's the holding capacitor, to the output. If that was negligible, why would they talk about that? And three, that the mixer directly demodulates the input signal, just like the Qualcomm case. And that was all supported by our expert, Dr. Shoemake. For example, at appendix 494 to 496, which is excited at appendix 50. So that's substantial evidence. That's ground one. Ground two, the Schiltz. This is at appendix 85 to 88 on the board's decision. There's substantial evidence that Schiltz is a storage module. For example, it's also a hold capacitor. Schiltz discloses a, quote, high-speed sample and hold circuit, unquote, comprising a switch capacitor. And it, quote, provides an improved radio, which uses a sample and hold circuit in various mixing applications, including down conversion, unquote. And this is by Dr. Shoemake in appendix 498 to 500, our expert. Schiltz also discloses, quote, radios that use a high-speed sample and hold circuit as a mixer. This is appendix 88. That the mixer, quote, operates as a down converter in radio 10. This is appendix 88. It also has commercial uses, not that it's required, but, quote, an improved radio having a receiver capable of receiving a wideband RF signal, unquote, appendix 88. So that's ground two. That's substantial evidence. I'll stop here unless the court has questions. The other side says that if you look at their incorporated 551 patent, they define that sample and hold capacitors hold negligible amounts of energy. And so, therefore, the fact that your reference that you're relying on is a holding capacitor means that it's storing only negligible amounts of energy. What do you have to say about that? I think that's primarily an end run around the claim construction. That verbiage comes from that paragraph that you all dealt with in the VDAL case and the board dealt with here, where it has multiple sentences that talk about holding modules and storage modules. But the lexicography was that the storage module just has to have non-negligible energy. It doesn't say, there's nothing in the construction that says if you hold the energy, it can't be non-negligible. I don't think that's even logical or a matter of engineering. And also, their patent, whatever it says about their invention, doesn't define the prior art inventions, which have non-negligible energy. Thank you. Thank you. All right, I'm up again. Smaller device. What was that? The smaller device. Smaller device, yes. I'll try to make it quick. Okay, so let me address a couple of issues. So Dr. Stier, again, don't believe our patent in terms of what holding elements are. Dr. Stier addressed that, number one. They have no expert that talked about holding elements and this, that, or the other thing and what they do. So it's Dr. Stier's unrebutted testimony further supports what the patent says about holding, and that's a negligible amount of energy. The counsel raised a number of arguments, their attorney arguments. He didn't identify anywhere where his expert. He was going through it and trying to cobble together stuff. He said, well, because it's releasing energy, therefore, it must be non-negligible. Where is that in the expert report? That's his statement. That's not his expert statement. There is no testimony from their expert that rebuts what Dr. Stier says, that says what he says is wrong. Again, they had the reply brief. They couldn't do it. They couldn't get their expert apparently to come up with these positions. That's telling. If you have an expert, you have an expert, why not use them? Possibly because the expert wouldn't take the positions because they're fundamentally flawed. That's not how the technology works. The technology does not work the way they're saying. They also said that he pointed to the patent office saying, well, for Gibson and Schiltz, that the technology is similar. It's similar in the sense that they both down convert. Sure, but it's not similar in any other sense. It's water and gasoline. They're both liquids, but they do very different things, and you can't put water, as we know, in your gas tank, and your car is going to work. It's not going to work very well. They try to excuse that they didn't address the issue. So going back to the issue of the untimeliness of when they raised their issue on the Qualcomm case. They tried to excuse that with, well, you could have asked the board for a surreply, which, by the way, it's not as a right. Maybe they would allow it, but that doesn't excuse. They had the burden. They knew about it. It was foreseeable. They had the burden to address the non-negligible amounts of energy, and they didn't do it. They chose not to do it. And when they had another opportunity to do it on reply, they couldn't get an expert to say it because it's not true. It's inconsistent. Their expert would not have been able to support the position to talk about these systems being commercially viable, to meeting standards. So that's it. I'm out of time. I think you got it. Thank you very much. Thank you.